IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

**SARAH PIAZZA AGUIRRE**,

     Plaintiff,

     v.

**MAYAGUEZ RESORT AND CASINO, INC.**,

     Defendant.

Civil No. 11-1549 (BJM)

## OPINION AND ORDER

Sarah Piazza Aguirre ("Piazza") brings this action against Mayaguez Resort and Casino, Inc. ("MRC"), alleging employment discrimination and retaliation under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101, the Family and Medical Leave Act ("FMLA"), 29 U.S.C. § 2601, and corresponding Puerto Rico laws; unlawful termination under Law No. 80 of May 30, 1976 ("Law 80"), 29 L.P.R.A. §§ 185a *et seq.*; and damages under Article 1802 of the Puerto Rico Civil Code, 31 L.P.R.A. § 5141. Docket No. 4 ("Compl."). Before the court is MRC's motion for summary judgment, Docket No. 70 ("Mot."), which Piazza opposed at Docket No. 79 ("Opp."). MRC also filed a reply (Docket No. 81), and Piazza filed a sur-reply (Docket No. 86). The parties consented to proceed before a magistrate judge. Docket No. 33.

In light of the findings of fact and legal discussion set forth below, the summary judgment motion is **GRANTED IN PART** and **DENIED IN PART**.

## BACKGROUND

This summary of the facts is guided by the parties' Local Rule 56 statements of uncontested facts. *See* Docket Nos. 58 ("SUMF"), 74 ("ASMF" at 36), 80.[1] I note that

---

[1] Local Rule 56 requires parties at summary judgment to supply brief, numbered statements of facts, supported by citations to admissible evidence. It "relieve[s] the district court of any responsibility to ferret through the record to discern whether any material fact is genuinely in dispute," *CMI Capital Market Inv. v. González-Toro*, 520 F.3d 58, 62 (1st Cir. 2008), and

both sides raise frivolous objections, and attempt to insert irrelevant facts and legal argumentation into the local rule's statements of facts.  This summary omits these glosses on the record; any sufficiently-developed disputes about the legal significance of record facts are addressed in this opinion's discussion section.

MRC operates a hotel and casino in Mayaguez, Puerto Rico.  Piazza began working as a Table Games Supervisor for MRC in January 2000.  SUMF ¶ 1.  In early 2001, she was promoted to Shift Manager for the Casino's night shift, which began at eight o'clock in the evening and ended at four in the morning.  SUMF ¶¶ 5, 9.  Piazza remained in the night shift through 2009.  Héctor Hernández was the Casino Manager in 2009 through April 2010.  SUMF ¶ 12.  Louis Muñoz was MRC's General Manager at this time.  SUMF ¶ 16.

In February 2009, Piazza's father, a diabetic, suffered a heart attack, followed by another heart attack in September 2009.  Later, in December 2009, one of his legs had to be amputated.  Piazza claims that MRC management knew that her father had suffered a heart attack in February and that he had serious health problems.  ASMF ¶¶ 27–28.  According to Hernández, he and other MRC managers, including Louis Muñoz, were informed that Piazza's father had a heart attack soon after it happened.  ASMF ¶ 29.  It is undisputed that by October 2009, Hernández knew Piazza's father had suffered a heart attack.  SUMF ¶ 24.

### First Shift Rotation Decision in 2009

Sometime in 2008 or early 2009, the Casino's revenues dropped at both table games and slot machines.  Louis Muñoz believed that a change in shift managers could improve the Casino's performance.  SUMF ¶ 17.  Around June 2009, he decided that instead of working the same shift every day, shift managers had to rotate through

---

prevents litigants from "shift[ing] the burden of organizing the evidence presented in a given case to the district court." *Mariani-Colón v. Dep't of Homeland Sec.*, 511 F.3d 216, 219 (1st Cir. 2007).  The rule "permits the district court to treat the moving party's statement of facts as uncontested" when not properly opposed, and litigants ignore it "at their peril."  *Id.*

different shifts on a regular basis.  SUMF ¶¶ 14, 16.  Piazza claims she was first notified on October 7, 2009 of this shift rotation decision, which was to take effect within in a few days.  ASMF ¶ 31.  That same day or immediately thereafter, Piazza talked to Hernández about her father's health condition and requested that she remain on the night shift or have the shift change postponed.  SUMF ¶ 20; ASMF ¶ 31.  A few days later, Piazza met with Louis Muñoz, explained to him how she was her father's primary caretaker, and reiterated her desire to remain on the night shift so she could take care of her father during the day.  SUMF ¶¶ 28–29.[2]  According to Hernández, Muñoz did not think it important that Piazza had significant caretaker responsibilities.  ASMF ¶ 33.  A month later, in mid-November 2009, Piazza met with Arturo Lugo, then co-owner of MRC and President of the Board of Directors, and discussed with him her concerns regarding the shift rotation decision.  SUMF ¶¶ 33, 51.  It was around this time that Piazza first presented a medical certificate from her father's doctor, which explained that he had a heart condition and Piazza was his primary caretaker during the day.  SUMF ¶¶ 34, 36.

A week earlier, on November 7, 2009, Hernández issued a written admonishment against Piazza.  ASMF ¶ 36.  Louis Muñoz instructed Hernández to write up the warning to Piazza.  *Id.*  That same month, Piazza claims that Hernández took away some of her significant supervisory and administrative duties, such as employee evaluations, scheduling, and participation in marketing activity.  ASMF ¶ 37.

Ultimately, MRC postponed Piazza's shift rotation such that she continued to work the night shift until January 2010.  SUMF ¶ 22.  In a letter dated January 10, 2010, Hernández informed her that she would be moved to the 4:00 p.m. to 12:00 a.m. shift, effective January 15.  SUMF ¶ 54.  The letter noted that while she was notified of this shift change back in June, because she had objected to the change at that time "for

---

[2] The parties dispute whether this meeting took place on October 8 or 10.  The exact date of the meeting appears to be irrelevant; what is clear is that plaintiff met with Louis Muñoz within days after Hernández notified her of the shift change.

personal reasons," MRC gave her six months to deal with her personal situation, and that management's decision to start rotating her shift was final.[3]   Docket No. 58-9.    Upon receipt of the letter, Piazza requested another meeting with Lugo, which took place on January 11.   Present at the meeting were Piazza, Lugo, HR Manager Leslie Santoni, and Louis Muñoz.   SUMF ¶ 59.   Piazza explained that the 4:00 p.m. start time would require her to leave home at 2:00 p.m., which would prevent her from attending to all her father's needs, and her father would be alone for four hours, from 2:00 until 6:00 p.m., when her brother returned from work.   SUMF ¶¶ 62–64.   She expressed concern that she was being treated unfairly.   At this meeting, Lugo offered to pay for the cost of having someone she trusted take care of her father during those hours when she had to be at work and her brother would not be home.   SUMF ¶ 65.   Plaintiff refused Lugo's offer.   SUMF ¶ 69.   On January 15, 2010, she moved to the 4:00 p.m. shift.   All other shift managers had their shifts changed at that time.   SUMF ¶ 87.   Jose Sanchez, then-Assistant Shift Manager, was assigned the 8:00 p.m. night shift.   ASMF ¶ 67.

According to Piazza, this 4:00 p.m. start time caused her not to be in charge of any particular shift, and she was required to report to an assistant manager or another shift manager in charge.   ASMF ¶ 55.   Moreover, she was relieved from certain duties of a shift manager, such as recording employee attendance, and conducting employee evaluations.   ASMF ¶ 56.

### *Subsequent Changes to Piazza's Shift Schedule and Responsibilities*

In May 2010, Luis Cortés was hired as MRC's new Casino Manager.   After he was hired, Louis Muñoz and Johnny Muñoz, a consultant to the Casino at the time, pressured Cortés to terminate Piazza.   ASMF ¶¶ 74–75.   In a senior management meeting on June 25, 2010, where Louis Muñoz, Johnny Muñoz, Arturo Lugo, Santos Alonso,[4] and

---

[3] As noted above, Piazza disagrees with this characterization of events, claiming that she first notified of the shift change in October, not June.

[4] Alonso was another owner of MRC at the time.

MRC's accountant were present, Louis Muñoz and Johnny Muñoz brought up Piazza, and discussed the possibility of terminating her employment.  ASMF ¶¶ 79–81.  That same day, Cortés notified plaintiff that her shift would start at noon, effective on July 1.  ASMF ¶ 83.  Piazza's schedule was changed again in September 2010, so that her days off were Thursday and Friday, which were the busiest days at the Casino.  ASMF ¶ 84.

On December 3, 2010, Piazza filed a discrimination charge with the EEOC. SUMF ¶ 107.  Subsequently, Piazza's schedule was changed on January 9, 2011 and then again in April, with an effective date of May 1, 2011.  SUMF ¶ 108; ASMF ¶¶ 130–31.

Sometime after MRC became aware of Piazza's father's disability and her caretaker responsibilities, MRC allegedly eliminated her work with the Casino's Asian clientele by not allowing her to work at tables that those clients preferred.  ASMF ¶ 140. In addition, on January 12, 2011, MRC held an important meeting with the new President of the Board, in which all managers and assistant managers were invited to attend. However, Piazza was not invited nor notified of the meeting.  ASMF ¶¶ 134.

At all relevant times, Piazza knew that she could request a leave of absence, but never requested it.  SUMF ¶ 103.  Piazza resigned from MRC on April 29, 2011.  SUMF ¶ 113.  She brought this action against MRC in June 2011.  Docket No. 1.

**SUMMARY JUDGMENT STANDARD**

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  A fact is material only if it "might affect the outcome of the suit under the governing law," *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986), and "[a] 'genuine' issue is one that could be resolved in favor of either party." *Calero-Cerezo v. U.S. Dep't of Justice*, 355 F.3d 6, 19 (1st Cir. 2004).  The court does not weigh facts, but instead ascertains whether the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Leary v. Dalton*, 58 F.3d 748, 751 (1st Cir. 1995).  On summary judgment, the court must find facts based on admissible

evidence, and should disregard that which is "inadmissible at trial, such as inadmissible hearsay." *Vazquez v. Lopez-Rosario*, 134 F.3d 28, 33 (1st Cir. 1998).

The movant must first "inform[] the district court of the basis for its motion," and identify the record materials "which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); R. 56(c)(1). If this threshold is met, the opponent "must do more than simply show that there is some metaphysical doubt as to the material facts" to avoid summary judgment. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The nonmoving party may not prevail with mere "conclusory allegations, improbable inferences, and unsupported speculation" for any element of the claim. *Medina-Muñoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 8 (1st Cir. 1990). Still, the court draws inferences and evaluates facts "in the light most favorable to the nonmoving party," *Leary*, 58 F.3d at 751, and the court must not "superimpose [its] own ideas of probability and likelihood (no matter how reasonable those ideas may be) upon the facts of the record." *Greenburg v. P.R. Maritime Shipping Auth.*, 835 F.2d 932, 936 (1st Cir. 1987).

## DISCUSSION

Piazza alleges that MRC (1) discriminated against her because of her association with her disabled father, and (2) retaliated against her for complaining about the shift change and for filing a complaint with the EEOC.[5] In addition to bringing these claims under the ADA and corresponding Puerto Rico law, Piazza also alleges that MRC is liable for violations of the FMLA, unlawful discharge in violation of Law No. 80, and tort damages under Article 1802 of the Puerto Rico Civil Code. MRC seeks summary judgment on all claims.

---

[5] Notably, Piazza does not contend that the defendant violated the ADA for failing to provide a reasonable accommodation. Opp. 2.

# I.      Association Discrimination

Plaintiff brings an association discrimination claim under the ADA and Law No. 44 of July 2, 1985 ("Law 44"), 1 L.P.R.A. §§ 501 *et seq.*.  Law 44 was enacted to prohibit discrimination against disabled individuals, and is modeled after the ADA.  *Torres-Alman v. Verizon Wireless P.R., Inc.*, 522 F. Supp. 2d 367, 401 (D.P.R. 2007).  Because the legislature's express intent was to conform the statute to the ADA, and the text of the local statute virtually mimics verbatim the federal scheme, "the elements of proof for a claim under Law 44 are essentially the same as those for establishing a claim under the ADA."  *Salgado-Candelario v. Ericsson Caribbean, Inc.*, 614 F. Supp. 2d 151, 175 (D.P.R. 2008).  Therefore, the court will analyze Piazza's association discrimination claim solely under the ADA.

The Americans with Disabilities Act broadly prohibits discrimination "in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment" on the basis of disability.  42 U.S.C. § 12112(a).  Specifically, the "association discrimination" provision of the ADA, § 12112(b)(4), prohibits employers from discriminating against a qualified employee or applicant because of their relationship with particular disabled persons.[6]  *See Oliveras-Sifre v. P.R. Dep't of Health*, 214 F.3d 23, 26 (1st Cir. 2000).  The statute "was intended to protect qualified individuals from adverse job actions based on unfounded stereotypes and assumptions arising from" their relationships with certain disabled individuals.  *Id*. (citing *Den Hartog v. Wasatch Acad.*, 129 F.3d 1076, 1081–85 (10th Cir. 1997)) (internal quotation omitted).  A familial relationship is a paradigmatic relationship contemplated by the association provision.  *Den Hartog*, 129 F.3d at 1082.  An employer's refusal to hire an otherwise qualified

---

[6] The statute prohibits discrimination by association by defining discrimination to include "excluding or otherwise denying equal jobs or benefits to a qualified individual because of the known disability of an individual with whom the qualified individual is known to have a relationship or association."  § 12112(b)(4).

applicant or termination of an employee, based on a belief that the individual would be distracted or miss work to care for a disabled relative, are examples of actionable conduct under the association provision.  *See Oliveras-Sifre*, 214 F.3d at 26; *Larimer v. Int'l Bus. Machs. Corp.*, 370 F.3d 698, 700 (7th Cir. 2004).

As with other employment discrimination claims, ADA discrimination claims may be established through direct or circumstantial evidence.  *See Ramos-Echevarria v. Pichis, Inc.*, 659 F.3d 182, 186 (1st Cir. 2011).  In opposing summary judgment, Piazza asserts the presence of both direct and circumstantial evidence of discrimination.  I will consider plaintiff's two theories in turn.

### A.      Direct Evidence of Discrimination

Direct evidence of discriminatory intent consists of "[c]omments which, fairly read, demonstrate that a decisionmaker made, or intended to make, employment decisions based on forbidden criteria."  *Febres v. Challenger Caribbean Corp.*, 214 F.3d 57, 61 (1st Cir. 2000).  On the one hand, the bare possibility of an innocent explanation for the statement does not make it any less direct.  *Id.*   However, "inherently ambiguous statements do not qualify as direct evidence."  *Weston-Smith v. Cooley Dickinson Hosp., Inc.*, 282 F.3d 60, 65 (1st Cir. 2002).  For instance, a decisionmaker's "admission—that age was one of three criteria used, at least in some cases, to determine which employees would be retained and which would not . . . constitutes direct evidence" of age discrimination.  *Febres*, 214 F.3d at 61.

First, it must be noted that there is no direct evidence that the first shift change decision (in 2009) was based on discriminatory animus.  MRC asserts, and Piazza does not seriously contest, that Louis Muñoz decided to implement a rotation system for shift managers around June 2009.  And while Piazza asserts that Hernández and Louis Muñoz knew that her father had a heart attack in February 2009, there is no evidence to suggest that Muñoz made the shift rotation decision in 2009 *because of* her association with her father.   Instead, Piazza contends that statements made by Louis Muñoz and Johnny

Muñoz in June 2010 constitute direct evidence of discrimination.  Cortés, then-Casino Manager, claims that he was pressed by Louis and Johnny Muñoz to terminate Piazza from MRC.  It appears that Louis and Johnny Muñoz were intent on removing Piazza or forcing her resignation, and instructed Cortés to change her shift schedule to make it harder for her to take care of her father.  Viewing the facts alleged in the light most favorable to Piazza, however, still does not suggest that Louis Muñoz, or anyone else at MRC, took or intended to take adverse actions against Piazza based on "forbidden criteria," that is, her relationship to her disabled father.  Louis and Johnny Muñoz may have wanted to use her caretaker status to pressure her into quitting, but it does not logically follow that her relationship with her father was the motivation for their hostility. On these facts, I find there is no direct evidence that a decisionmaker at MRC "made, or intended to make, employment decisions" based on her association with a disabled person.  *Febres*, 214 F.3d at 61.

### B.    Circumstantial Evidence – Prima Facie Case

In the absence of direct evidence, a plaintiff may proceed under the burden-shifting framework articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 801–03 (1973).  First, the plaintiff must establish a prima facie case of association discrimination, showing that: (1) she was qualified for job, (2) she suffered an adverse employment action, (3) the employer knew that the plaintiff had a relative or associate with a disability, and (4) circumstances raise "a reasonable inference that the disability of the relative or associate was a determining factor in the employer's decision." *Torres-Alman*, 522 F. Supp. 2d at 387; *Den Hartog*, 129 F.3d at 1085.  Once the plaintiff establishes a prima facie case, the employer has the burden of producing a "legitimate, non-discriminatory reason for its action"; if the employer does so, the burden shifts back to the plaintiff, who must show that the employer's articulated reason is "mere pretext cloaking discriminatory animus."  *Ramos-Echevarria*, 659 F.3d at 186–87.

MRC concedes for purposes of summary judgment that Piazza was qualified for her job at the time of the alleged adverse employment actions.  However, MRC contends that (1) Piazza did not suffer any adverse employment actions, (2) at the time of the alleged adverse actions, MRC did not know of Piazza's father's disability, and (3) the facts do not raise a reasonable inference that MRC's acts were motivated by Piazza's association with her disabled father.[7]

First, I find that there is a genuine issue of material fact as to when MRC learned of Piazza's father's disability.  MRC argues that the shift rotation decision was reached in June 2009, before Louis Muñoz learned of Piazza's father's health problems.  Piazza's father had two heart attacks, one in February and another in September 2009.  Hernández stated that he and other MRC managers, including Louis Muñoz, knew Piazza's father was diabetic and were informed that Piazza's father had a heart attack the day it happened.  The record is unclear as to which heart attack Hernández is referring to.  MRC may have known that Piazza's father had a heart attack and was in a fragile state by June 2009 when the shift rotation decision was allegedly made.[8]  Piazza has thus raised a genuine issue as to MRC's knowledge of her association with her disabled father.  I will proceed to address whether MRC's alleged conduct constituted adverse employment actions, and whether the facts adduced raise a reasonable inference of discriminatory intent.

### 1.    *Adverse Employment Action*

For an action to be adverse, it "must materially change the conditions of plaintiff['s] employ."  *Gu v. Boston Police Dep't*, 312 F.3d 6, 14 (1st Cir. 2002); *Castro-Medina v. Procter & Gamble Commercial Co.*, 565 F. Supp. 2d 343, 371 (D.P.R. 2008).

---

[7] For purposes of summary judgment, MRC assumes that Piazza's father was a disabled individual within the meaning and scope of the ADA.  Mot. 12 n.5.

[8] Piazza's failure to provide a medical certificate regarding her father's medical condition until November 2009 does not mean that MRC did not know about her father's disability.  *See Colon v. San Juan Marriott Resort & Stellaris Casino*, 600 F. Supp. 2d 295, 307 (D.P.R. 2008).

Whether a change is adverse is based on an objective standard. *Marrero v. Goya of P.R.*, 304 F.3d 7, 23 (1st Cir. 2002). "Material changes include 'demotions, disadvantageous transfers or assignments, refusals to promote, unwarranted negative job evaluations, and toleration of harassment by other employees.'" *Gu*, 312 F.3d at 14 (quoting *Hernández-Torres v. Intercontinental Trading, Inc.*, 158 F.3d 43, 47 (1st Cir. 1998)). A "reassignment that involves only minor changes in working conditions normally does not constitute an adverse employment action." *Marrero*, 304 F.3d at 23. At the same time, a reduction in salary or benefits is not necessary for an action to be materially adverse so long as the action is "equally adverse." *Id.* at 23–24.

Piazza claims that the following are adverse employment actions: (1) shift changes, starting in January 2010 through April 2011; (2) stripping of her supervisory role and administrative duties; (3) a written admonishment from Hernández in November 2009; (4) elimination of her Asian clientele; and (5) excluding her from a meeting with Senior Management in January 2011.[9] She also asserts she suffered an adverse employment action through constructive discharge. *See* Opp. 18.

I first note that the third and fourth alleged acts do not constitute adverse employment actions. Contrary to Piazza's contention, "[w]hether an admonishment constitutes an adverse employment action may depend on a number of factors, including in particular its practical consequences." *Sanchez-Rodriguez v. AT&T Mobility P.R., Inc.*,

---

[9] Piazza also claims as an adverse employment action MRC management's defamatory remarks about her to her clients. *See* Opp. 17. However, plaintiff's statement of facts does not provide specifics and the record lacks evidence to support this allegation. In any event, the alleged remarks cannot be said to materially alter the *terms* or *conditions* of plaintiff's employ such that it constitutes an adverse employment action. In this same section, Piazza asserts in a conclusory fashion that defendant created a hostile work environment. However, a hostile work environment claim is a separate theory of recovery under the ADA, *see Quiles-Quiles v. Henderson*, 439 F.3d 1, 5 n.1 (1st Cir. 2006), one that was not clearly set forth by plaintiff in her motion. Therefore, I will not consider a hostile work environment claim for purposes of this summary judgment motion. *Velásquez Rodríguez v. Mun'y of San Juan*, 659 F.3d 168, 175 (1st Cir. 2011) (parties have a duty to articulate distinct legal theories with thorough arguments and citation to legal authority).

673 F.3d 1, 15 (1st Cir. 2012).  The practical consequences of the November written warning are unclear, and Piazza never claims that the warning was frivolous or unwarranted.   On this record, no reasonable jury could find that the written admonishment from Hernández in November 2009 was a *materially* adverse action for purposes of her ADA discrimination claim.  Similarly, Piazza provides little detail on the supposed elimination of her Asian clientele.  For one, there is no evidence as to when MRC removed her access to the Asian clientele.  The record also does not indicate that shift managers were routinely assigned certain clientele, and that Piazza's work with Asian clientele was a material working condition.   The party opposing summary judgment may not prevail with mere "conclusory allegations, improbable inferences, and unsupported speculation" for any element of the claim.  *Medina-Muñoz*, 896 F.2d at 8. Thus, I find these two alleged adverse actions without merit.

### Constructive Discharge

Piazza also fails on her claim of constructive discharge.  To establish constructive discharge, a plaintiff generally must show that her working conditions were so difficult or unpleasant that a reasonable person in plaintiff's position would have felt compelled to resign.  *Marrero*, 304 F.3d at 28.  The standard is objective, not subjective; "the ordinary slings and arrows that workers routinely encounter" in the workplace are not enough to amount to constructive discharge.  *De La Vega v. San Juan Star, Inc.*, 377 F.3d 111, 117 (1st Cir. 2004) (citation and quotation omitted).  A reassignment with significantly diminished job responsibilities, or a decision causing a significant change in benefits may constitute constructive discharge.  *See Leavitt v. Wal-Mart Stores, Inc.*, 74 Fed. Appx. 66, 69 (1st Cir. 2003) (citation and quotation omitted).  But "a reduction in responsibility . . . unaccompanied by diminution of salary or some other marked lessening of the quality of working conditions, does not constitute a constructive discharge."  *Suarez v. Pueblo Int'l, Inc.*, 229 F.3d 49, 55 (1st Cir. 2000).  In assessing a constructive discharge claim, another

factor to consider is the employer's response to the employee's complaints, if any. *Marrero*, 304 F.3d at 28.

Here, plaintiff did not experience working conditions so unbearable that a reasonable person in plaintiff's shoes would be compelled to resign. MRC decided to institute a rotation system for shift managers in 2009, and Piazza was moved from the 8:00 p.m. night shift to an earlier shift starting in January 2010. In June 2010, she was moved to the noon shift. Then in September, MRC changed her schedule such that her days off would be on Thursdays and Fridays. In January 2011, her schedule changed again so that she worked different shifts on different days. Another shift rotation was announced in April 2011, to take effect in May. Piazza resigned in late April, before this last rotation took effect. She argues that MRC kept changing her schedule and gave her undesirable shifts in attempts to force her resignation. She points out that Jose Sanchez, who she claims used to report to her, was assigned the 8:00 p.m. night shift in January 2010 and remained in that shift through May 2011. But the shift rotation schedules also show that managers other than Sanchez experienced schedule changes (in start time and days off) similar to Piazza. Sanchez may have received favorable treatment, but Piazza's rotations were on par with other managers. Piazza's responsibilities may have been reduced, and she alleges that MRC management humiliated, defamed, persecuted, and monitored her. But Piazza suffered no salary decrease, and never filed a formal complaint with the company regarding her treatment. At bottom, Piazza may have been treated unfairly, perhaps even on purpose, given Louis and Johnny Muñoz's seemingly unexplained hostility, but it cannot be said that the conditions of her employment prior to her resignation were intolerable. Her complaints are more attributable to "the usual ebb and flow of power relations and inter-office politics." *Suarez*, 229 F.3d at 54 (finding defendant's efforts to marginalize plaintiff by imposing harsh deadlines and excluding him from meetings does not state a claim of constructive discharge); *see also Marrero*, 304 F.3d at 28 (noting that to establish constructive discharge, plaintiff must show a

greater severity or pervasiveness of harassment than that required in a hostile environment claim). In sum, on this factual record, a jury could not reasonably conclude that Piazza was constructively discharged.

### Shift Changes and Reduction in Responsibilities

Turning to the remaining practices, I find that Piazza has raised a genuine issue as to whether the shift changes, removal of certain responsibilities, and exclusion from an important meeting constitute adverse employment actions. To be sure, a lateral transfer or shift change "that does not involve a demotion in form or substance, cannot rise to the level of a materially adverse employment action." *Marrero*, 304 F.3d at 23. Thus, the shift changes, standing alone, do not constitute adverse employment actions as they do not affect the terms of Piazza's employment. She claims, however, that the change from the 8:00 p.m. night shift to the 4:00 p.m. shift is effectively a demotion because when starting at 4:00 p.m., she was not in charge of any particular shift, and had to report to an assistant manager or another shift manager in charge. This change, she alleges, also took away certain managerial responsibilities, such as recording employee attendance and conducting employee evaluations. Having already been stripped of certain supervisory and administrative duties in November 2009, by the time she started the 4:00 p.m. shift in January 2010, she claims she had been effectively demoted. The shift change also exploited her particular vulnerability. For others, rotating from the night shift to an earlier shift would be inconsequential. But for her, it meant that she would be unable to fulfill her caretaker duties during the day, and leave her father unattended for several hours. On these facts, a reasonable jury could find MRC's conduct of continually changing Piazza's shift schedule to be materially adverse. *Cf. Washington v. Ill. Dep't of Revenue*, 420 F.3d 658, 662–63 (7th Cir. 2005) (noting that a reassignment involving a change in hours normally would not be materially adverse, but employee had sought and been approved for flex-time to allow her to care for her disabled son, and thus change was potentially materially adverse); *Freedman v. MCI Telecomms. Corp.*, 255 F.3d 840,

844 (D.C. Cir. 2001) (suggesting that a transfer from a day shift to the night shift could constitute an adverse employment action in a Title VII discrimination claim).

### 2.    *Reasonable Inference of Association Discrimination*

The fourth element of the prima facie case requires a plaintiff to produce evidence sufficient to raise "a reasonable inference that the disability of the relative or associate was a determining factor in the employer's decision." *Den Hartog*, 129 F.3d 1085.  The Seventh Circuit takes this to mean that the plaintiff must show "he was discriminated against because of the disability of a person with whom he has a relationship or other association." *Larimer*, 370 F.3d at 701.  Piazza is unable to discharge her burden on this prong.  Other than temporal proximity, there is simply no evidence suggesting that Louis Muñoz, or any other decisionmaker at MRC, chose to change Piazza's shifts *because of* her father's disability.  MRC managers learned that Piazza's father had suffered a heart attack and was seriously ill by October 2009.  Around that same time, MRC formally notified Piazza of the shift rotation decision.  Over the next year and a half, Piazza's schedule changed every few months, and she was allegedly stripped of certain managerial responsibilities.  While temporal proximity alone often suffices to establish causal nexus and a prima facie case in other discrimination cases, here Piazza must provide some factual support to raise an inference of association discrimination.  *Larimer*, 370 F.3d at 701 (noting true parallel of *McDonnell Douglas* prima facie case would require less than "reasonable inference" standard).  Piazza's arguments on this issue are unpersuasive.

First, Piazza points to Hernández's testimony that Muñoz did not give any weight to the fact that she was her father's primary caretaker.  But Muñoz's indifference, rather than supporting Piazza's claim, implies that Muñoz's actions were taken despite Piazza's association with her disabled father.  Additionally, Lugo's offer in January 2010 to pay for someone to take care of Piazza's father also negates an inference of discriminatory intent.  And finally, as discussed above, Louis and Johnny Muñoz's alleged comments from June 2010 suggest that they wanted to fire Piazza or force her resignation.  But that

intent alone does not explain the reason for their hostility.  It may be that they simply did not like her and felt that she had to go.  In sum, because Piazza cannot demonstrate a causal connection between her association with her father and the alleged adverse practices, MRC is entitled to summary judgment on her association discrimination claim. *Cf. Ennis v. Nat'l Ass'n of Bus. & Educ. Radio, Inc.*, 53 F.3d 55, 62 (4th Cir. 1995) (holding that "without factual support," plaintiff failed "to establish the fourth prong of the *prima facie* case—that the discharge occurred under circumstances that would permit an inference of discrimination on the basis of an impermissible factor").

## II.       Retaliation under ADA

The ADA also prohibits retaliation against an employee for, among other grounds, having "opposed any act or practice made unlawful" by the act.  42 U.S.C. § 12203(a).  A plaintiff need not prevail on a discrimination claim to have a claim for retaliation under the ADA.  *Colón-Fontanez v. Mun'y of San Juan*, 660 F.3d 17, 36 (1st Cir. 2011).  To establish a prima facie case of retaliation, the plaintiff "must show that: (1) she was engaged in protected conduct; (2) suffered an adverse employment action; and (3) there was a causal connection between the protected conduct and the adverse action."  *Id.* Requesting a reasonable accommodation is a protected activity under the ADA, as is "complaining of discrimination on the basis of disability."  *Valle-Arce v. P.R. Ports Auth.*, 651 F.3d 190, 198 (1st Cir. 2011).  No underlying discrimination need be proven; "[i]t is enough that the plaintiff had a reasonable, good-faith belief that a violation occurred; that he acted on it; that the employer knew of the plaintiff's conduct; and that the employer lashed out in consequence of it."  *Mesnick v. Gen. Elec. Co.*, 950 F.2d 816, 827 (1st Cir. 1991).  "To defeat summary judgment in a retaliation case, a plaintiff must point to *some* evidence of retaliation by a pertinent decisionmaker."  *Sánchez-Rodríguez*, 673 F.3d at 15 (emphasis in original) (internal quotations omitted).

MRC contends that Piazza's retaliation claim fails because (1) she did not engage in protected conduct, as her belief that she was being discriminated against was not

objectively reasonable, and (2) she was not subjected to any adverse employment actions. Both arguments are meritless.

Piazza asserts two instances of protected activity: (1) her verbal complaints to MRC management about the shift rotation decision in late 2009, and (2) filing of the EEOC discrimination charge in December 2010.   The filing of an administrative complaint and voicing informal complaints to supervisors are no doubt protected activities.   *Valentin-Almeyda v. Mun'y of Aguadilla*, 447 F.3d 85, 94 (1st Cir. 2006) (noting that in Title VII context, "[p]rotected conduct includes not only the filing of administrative complaints, but also complaining to one's supervisors"); *Torres-Alman*, 522 F. Supp. 2d at 394 (ADA retaliation context).   And while the court holds today that Piazza does not have a viable claim of association discrimination, it cannot be said that at the time of her complaints, Piazza's belief that she was being discriminated against was clearly unreasonable.

Moreover, in view of the discussion set forth in the preceding sections, it is clear that Piazza has raised genuine issues as to whether she suffered adverse employment actions at the hands of MRC management.   Although Piazza cannot proceed under a claim of constructive discharge, a reasonable jury could find that the various schedule changes and removal of her supervisory responsibilities were materially adverse employment actions taken in retaliation for her complaints of discrimination. Importantly, Piazza has adduced sufficient evidence to establish temporal proximity between her protected conduct and adverse employment actions.   *DeCaire v. Mukasey*, 530 F.3d 1, 19 (1st Cir. 2008) ("temporal proximity alone can suffice to meet the relatively light burden of establishing [causal nexus in] a prima facie case of retaliation"). Piazza complained to Hernández, Louis Muñoz, and Lugo on multiple occasions between October 2009 and January 2010.   In November 2009, she was allegedly stripped of certain supervisory duties.   At the last meeting before her shift change went into effect, with Lugo and HR Manager Leslie Santoni present, Piazza stated that she was being

treated unfairly.  In June, she was moved up to the noon shift.  After filing the EEOC complaint in December 2010, she was excluded from a senior management meeting in January that all other managers had been invited to.  Because Piazza has presented sufficient evidence to establish a prima facie case of retaliation, the burden shifts to the employer to provide a legitimate, non-retaliatory reason for its actions.

MRC, however, has not met its burden of articulating a legitimate reason for its actions against Piazza.  In moving for summary judgment, MRC explains that the initial decision to rotate shift managers was motivated by a desire to improve the Casino's performance.  In 2008 or early 2009, the Casino saw a drop in revenues, and Louis Muñoz thought that a change in shift schedules may improve the Casino's revenue figures.  This appears to be a legitimate, non-discriminatory reason for changing the shift manager's schedules, but it does not explain why Piazza was stripped of certain administrative or supervisory duties, nor does it justify excluding her from a meeting with senior management in January 2011.  In short, because MRC has not provided ample non-retaliatory reasons for its adverse actions, summary judgment is not warranted at this time.[10]

## III.   Retaliation under Law No. 115

Plaintiff also brings a retaliation claim under Law No. 115 of December 20, 1991 ("Law 115"), 29 L.P.R.A. § 194a.  MRC does not seek dismissal of this claim on substantive grounds, but only asks the court to not exercise supplemental jurisdiction over this claim.  Mot. 34.  Because Piazza's ADA retaliation claim survives summary judgment, I see no reason to decline to exercise jurisdiction over the Law 115 claim. Defendant is likewise not entitled to summary judgment on the Law 115 claim.

---

[10] And there is no need to reach final step of the *McDonnell Douglas* framework, namely, whether the employer's asserted rationale is pretextual.

## IV.     Family Medical Leave Act

Piazza next asserts that Muñoz's hostility discouraged her from exercising her FMLA rights.  Opp. 38.  MRC contends that Piazza never triggered the protections of the FMLA because she failed to provide notice of her need for FMLA leave.  Mot. 35–36. MRC also notes that Piazza cannot state a FMLA retaliation claim because she never availed herself of the benefits under the act.  This latter argument was not opposed by the plaintiff.

The Family Medical Leave Act was enacted to balance "the tension that so often exists between the demands of earning a living and the obligations of family life." *Navarro v. Pfizer Corp.*, 261 F.3d 90, 94 (1st Cir. 2001).  The act provides eligible employees of covered employers with up to twelve weeks of unpaid leave in a twelve-month period to tend to familial needs, such as the care of a family member with a serious medical condition.  *Id.*; 29 U.S.C. §§ 2601, 2611, 2612.  Employees may take leave on an intermittent basis (in distinct blocks of time) or via a reduced work schedule (e.g. from full-time to part-time).  *Id.* § 2612(b)(1); 29 C.F.R. § 825.202(a).  It is "unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise" rights provided under the FMLA, 29 U.S.C. § 2615(a)(1), and to retaliate against employees for exercising or attempting to exercise FMLA rights, § 2615(a)(2), (b).

Where a plaintiff claims that the employer unlawfully interfered with the exercise of substantive rights provided by the FMLA, she "need only show, by a preponderance of the evidence, entitlement to the disputed leave; no showing as to employer intent is required."[11]  *Colburn v. Parker Hannifin/Nichols Portland Div.*, 429 F.3d 325, 331 (1st

---

[11] In contrast, where the claim alleges retaliation for the exercise or attempted exercise of FMLA rights, a plaintiff proceeds under the *McDonnell Douglas* framework and bears the ultimate burden of proving discriminatory animus.  429 F.3d at 332; *Hodgens v. Gen. Dynamics Corp.*, 144 F.3d 151, 160–61 (1st Cir. 1998).  The demarcation between interference and retaliation claims is unclear, but irrespective of the terminology used, the elements of a particular

Cir. 2005).  To establish a prima facie case of interference with FMLA rights, a plaintiff must show that: (1) she was an eligible employee, (2) the defendant is a covered employer, (3) the employee was entitled to FMLA leave, (4) she provided adequate notice to her employer of her intention to take leave, and (5) she was denied benefits to which she was entitled under FMLA.  *See Carrero-Ojeda v. Autoridad de Energia Electrica*, 12-2133, 2014 WL 2786536, at *11 n.8 (1st Cir. June 20, 2014).   In her opposition, Piazza alleges interference, but does not squarely address whether these five elements are satisfied.  Even assuming that she is an eligible employee, that MRC is a FMLA-covered employer, that her father suffered from a serious health condition entitling her to leave, and MRC interfered with her exercise of that right, her prima facie case fails for failure to provide adequate notice.

An employee seeking leave under the FMLA generally must provide timely notice to the employer of her intention to take leave.  29 U.S.C. § 2612(e).  Notice need not be perfect, and the employee need not explicitly mention the FMLA, but the employee must proffer sufficient information to reasonably apprise the employer of the need for a leave.  *Greenwell v. State Farm Mut. Auto. Ins. Co.*, 486 F.3d 840, 842 (5th Cir. 2007).

In this case, Piazza's remarks to MRC management were insufficient to put the defendant on notice of her desire for FMLA leave.  Although she reasonably apprised MRC of her father's medical condition, she never indicated that she wished to take a leave of absence—for an extended period of time, intermittently, or on a reduced work schedule.  Piazza knew she could request a leave of absence, but never did.  What she wanted was not to take a leave of absence per se, but to maintain her full-time workload, and insist on a shift schedule that best suited her familial obligations.  On these facts, it cannot be said that the plaintiff provided MRC sufficient information to put it on notice

---

FMLA claim "differ depending on whether the plaintiff is, at bottom, claiming that the employer denied his or her substantive rights under the FMLA or that the employer retaliated against him or her for having exercised or attempted to exercise those rights."  *Colburn*, 429 F.3d at 332.

that a FMLA leave was needed or desired. *Cf. De Hoyos v. Bristol Labs. Corp.*, 218 F. Supp. 2d 222, 226 (D.P.R. 2002) (finding plaintiff does not have a cause of action under FMLA; although plaintiff took days off, they were designated as vacation days, and plaintiff never requested leave under the FMLA in writing or orally).

In sum, because plaintiff did not provide adequate notice to MRC of her desire for FMLA leave, her FMLA claim cannot prosper, and MRC is entitled to summary judgment.

## V.    Unlawful Termination under Law No. 80

Law 80 "requires employers to compensate employees who are discharged without just cause." *Baltodano v. Merck, Sharp & Dohme (I.A.) Corp.*, 637 F.3d 38, 41–42 (1st Cir. 2011). Discriminatory animus and retaliation do not constitute just cause; the statute enumerates numerous grounds for termination that constitute "just cause." *See* 29 L.P.R.A. § 185b. Under Law 80, an employee bears the initial burden of alleging unjustified dismissal and proving actual dismissal. *Baltodano*, 637 F.3d at 42. If shown, the burden of persuasion shifts to the employer to prove that the discharge was justified. *Id.* The burden then shifts back to the employee to show a lack of just cause. *Id.* In this case, MRC did not terminate Piazza's employment—she resigned. As explained in Part I, *supra*, the circumstances surrounding her employment and resignation do not amount to constructive discharge. Thus, plaintiff cannot satisfy her initial burden of proving actual dismissal, and the Law 80 claim must be dismissed for failure to state a cause of action.

## VI.    Tort Claims under Article 1802

Lastly, Piazza's Article 1802 claim is not cognizable because it arises from the same facts as plaintiff's claims under the ADA, FMLA, and Laws 44, 80, and 115. The tort provision of the Civil Code is supplementary to special legislation, so, to the extent that a special labor law covers the conduct for which a plaintiff seeks damages, she is barred from using that same conduct as the basis for a claim under Article 1802. *Rivera-Melendez v. Pfizer Pharm., Inc.*, 747 F. Supp. 2d 336, 339 (D.P.R. 2010) (citations and

quotations omitted); *Medina v. Adecco*, 561 F. Supp. 2d 162, 175–76 (D.P.R. 2008) (citations omitted).  Under this cause of action, Piazza alleged that MRC systematically embarrassed and humiliated her, "wrongfully isolated and excluded [her] from the course of a regularly conducted business activity," and "intentionally publicized defamatory comments against Piazza."  Compl. at 19–20.  Because the tortious conduct Piazza complains of (*i.e.*, harassment, discrimination, and retaliation) is the same conduct that forms the basis of her discrimination, constructive discharge, and retaliation claims, this additional claim under Article 1802 should be dismissed.

## CONCLUSION

For the foregoing reasons, MRC's summary judgment motion is **GRANTED IN PART** and **DENIED IN PART**.  All of Piazza's claims are dismissed, except for her retaliation claim under the ADA and Law 115.

**IT IS SO ORDERED.**

In San Juan, Puerto Rico, this 24th day of July, 2014.

*S/ Bruce J. McGiverin*
BRUCE J. McGIVERIN
United States Magistrate Judge